# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

TODD D. HARRISON,                    :

    Plaintiff,                    :

                                    Case No. 3:14cv00142

vs.                                  :

                                      District Judge Walter Herbert Rice

CAROLYN COLVIN,                      :     Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,             :

    Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Todd D. Harrison applied for Supplemental Security Income in October 2009.  He asserted that he could no longer work a substantial paid job as of June 15, 2009 due to many health problems, including attention deficit hyperactivity disorder, other mental health problems, and back pain.  He also informed that Social Security Administration that he was a slow learner.

Administrative Law Judge Irma J. Flottman denied Plaintiff's application based on her main conclusion that he was not under a "disability" within the meaning of the Social Security Act.  Plaintiff brings the present case *pro se* challenging ALJ Flottman's non-

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

disability decision.

The case is before the Court upon Plaintiff's Statement of Specific Issues (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. #14), the administrative record (Doc. #7), and the record as a whole.

Plaintiff seeks an Order finding that the evidence overwhelmly establishes the existence of his disability and thus qualifies him to receive Supplemental Security Income. (Doc. #14, PageID #744). The Commissioner asks the Court to affirm the ALJ's non-disability decision.

## II.    <u>Background</u>

## A.    <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 38 years old on the date he applied for Supplemental Security Income. The ALJ therefore considered him a "younger" person under Social Security regulations. The ALJ found Plaintiff to have a "limited" education as defined in the regulations. He worked in the past as a janitor.

The ALJ held a hearing in May 2012 during which Plaintiff was represented by an attorney. Plaintiff acknowledged that he had been in prison starting about age 17 (in the late 1980s). He was first incarcerated in Mansfield Correctional Institution for about 1 year. Plaintiff testified that while in Mansfield, he observed things he had never seen before like "killings and stuff like that ... really just tore [him] apart." (Doc. #7, *PageID#* 97). His most recent incarceration ended in 2008. *See id.* at 307.

Plaintiff testified that he suffered gunshot wounds in the past.  This happened to him twice: once in 1997 and again in 2001.  Each time he was hospitalized.  *Id*. at 308.   He was wounded in his back, left shoulder, and left inner thigh that required surgery.  He explained that he has pain and numbness as a result of his gunshot wounds.  His leg goes numb.  Every day he experiences "real sharp pain.  It's unbelievable pain."  *Id*. at 99.  He takes Vicodin for pain, and he noted that Vicodin helps and "relieves it enough to where I know I have to take bed rest."  *Id.* at 100.  He also has daily pain in his big toe and has spasms in his lower back.

Plaintiff experiences depression and anxiety.  Anxiety makes him start to sweat, then he gets lightheaded and sometimes passes out.  He explained, "It like comes and goes, depending on the situation.  Like if I get around a lot of people, I just, I kind of get, I get scared and ... that's when I have to lay [down] ....  And then when I talked to a counselor she showed me a remedy of breathing in and out in order to like control it or bring it down."  *Id*. at 102.  To treat his depression and anxiety, he takes Trazadone, Tramadol, Depakote, Elavil, Klonopin, and Trilafon.  His side effects from these medications include dry mouth, sometimes diarrhea, and drowsiness, which lasts more than 6 or 8 hours.

Plaintiff testified that he can walk about ½ block before he must stop.  When he takes his medication, he can stand or walk for about 10 minutes before needing to sit.  When he does not take medication, he can only stand or walk for about 5 minutes before needing to sit.  He can sit for about 10 minutes at a time before he needs to stand.  He

3

cannot lift more than 10 pounds.  It is too painful for him to reach above his right shoulder. It takes him a long time to climb steps due to pain.  He has problems with balance, and it is very difficult for him to bend due to pain in his lower back.

As to his typical daily activities, Plaintiff testified that when he gets up, he gets his medications ready.  Within 10 to 15 minutes after taking his medications, he must get in bed and then watches TV all day.  *Id*. at 105.  His grandmother prepares meals for him and does the dishes.  He never goes shopping.  He does not have hobbies except "[p]robably like play[ing] with the squirrels and cats and stuff."  *Id*. at 106.  He can no longer engage in his past hobbies like running or playing basketball.  His sister visits him about 3 times a week.

Plaintiff stated that he does not see others on a regular basis and does not belong to a group of any kind.  He explained:

> It's like I kind of, just being around people from the circumstances that I've been through, people calling me dummy, that I'm retarded and I'm slow.  It's like it just has a[n] overwhelming bearing on me and it's like I just feel like I'm not worth anything.

*Id*. at 109.  Plaintiff noted that he went to the hospital the year before the ALJ's hearing because he felt depressed and suicidal.

About 2½ years before the ALJ's hearing, Plaintiff completed alcohol and marijuana counseling.  He does not attend Alcoholics Anonymous or Narcotics Anonymous meetings because he has difficulty being around people.

### B.     <u>Additional Evidence</u>

Treatment notes from Plaintiff's "Ambulatory Care Visit" in June 2009, written by Anita Lewis, M.D., restricted Plaintiff to lifting no more than 20 pounds and standing less than 30 minutes with frequent breaks.  (Doc. #7, *PageID* #303).  Dr. Lewis observed, "marked muscular weakness and stiffness in both RE [presumably, Right Extremities] and LE [presumably, Left Extremities] ...."  *Id*.  Dr. Lewis assessed Plaintiff with peripheral neuropathy, a history of hypertension, and insomnia.

An Adult Diagnostic Assessment from Eastway Behavioral Healthcare in November 2009 stated that Plaintiff "reported auditory hallucination beginning, and reported feeling distressed about them – suggestions through whispers, and feelings of demon being in dreams.  [Plaintiff] was well dressed, groomed, and oriented x4 during interview, and seeking help 'to get my mind straight before it gets worse.'"  *Id*. at 448.  The social worker who evaluated Plaintiff checked boxes indicating that his thought processes were logical, his mood was euthymic, and his affect was full.  *Id*.  He was diagnosed with bipolar disorder with current depression.  *Id*. at 451.

In March 2010, psychologist Dr. Bonds examined Plaintiff.  According to Dr. Bonds, Plaintiff reported that he completed the 10th grade but did not graduate and has not earned a GED.  During school he took special education classes "for learning and behavioral problems and his grades were usually below average."  *Id*. at 307.  Dr. Bonds found Plaintiff moderately impaired in his ability to relate to peers, supervisors, or the

5

public. Dr. Bonds explained, "[Plaintiff] has poor control of his anger and aggressiveness. He also tends to be very distrustful of people. He would have difficulty with taking criticism and resolving interpersonal problems at work." *Id*. at 312. Dr. Bonds further opined that Plaintiff was mildly impaired in his ability to understand, remember, and follow instructions; moderately impaired in his ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks; and moderately impaired in his ability to withstand the stress and pressure associated with day-to-day work activities *Id*. at 313. And, Dr. Bonds reported, "[Plaintiff's] social functioning is severely impaired by his poor anger management and antisocial characteristics." *Id*. at 312.

In May 2010, psychologist Dr. Goldsmith reviewed the evidence of record and concluded that Plaintiff could perform simple, repetitive tasks in a low-stress environment. *Id*. at 318. Dr. Goldsmith noted that Plaintiff has not kept a job longer than a few months due to problems getting along with coworkers and supervisors. *Id*. Dr. Goldsmith reported that Plaintiff had "complained of feelings of depression, nervousness, fear, and tension. He complains of problems controlling his temper and gets in frequent arguments and fights. He has problems maintaining his attention and concentration...." *Id*.

Dr. Goldsmith opined that Plaintiff was moderately limited in social relating and in "C/P/P" (Concentration/Persistence/Pace). *Id*. His ability to understand, remember, and follow instructions was mildly impaired. *Id*. According to Dr. Goldsmith, Plaintiff could "perform SRP [Simple, Repetitive, Tasks] in a low stress environment." *Id*. About 8

6

months later, in January 2011, psychologist Dr. Tishler reviewed the record and provided a

2-sentence evaluation.  Doing so, he pointed to Plaintiff's additional medical records,

including his school records and full-scale IQ score at 78 at age 15.  Dr. Tishler opined that

this would still support Dr. Goldsmith's opinion that Plaintiff had the mental residual

functional capacity to perform simple, repetitive tasks.  *Id*. at 426.  Dr. Tishler omitted any

further reference to the record or comment or analysis in support of his opinions.  *Id*.

In January 2011, Sarah Long, MD reviewed the file and found Plaintiff unable to

perform a restricted range of light work with only occasional climbing of

ladders/rope/scaffolds, stooping, kneeling, crouching, and crawling.  *Id*. at 427-34.

A month before Dr. Long reviewed the record, Dr. Danopulos examined Plaintiff.

*Id*. at 415-25.  Dr. Danopulos' objective findings included lumbar-spine arthralgia, right-

shoulder arthralgia, and right-foot arthralgia.  Dr. Danopulos explained that Plaintiff had

"left calf area swelling after he underwent surgery for a gunshot in his left upper leg and

they repaired arterial and venous circulation, which was damaged by the gunshot ...."  *Id*. at

419.  Dr. Danopulos reported that Plaintiff had a "[h]istory of mood swings, bipolar

disease, and social problems with three incarcerations starting at age 18."  *Id*.  According to

Dr. Danopulos, "[Plaintiff's] ability to do any work-related activities is affected and

restricted from his poor adaptation to society with history of bipolar disease and mood

swings, plus his lumbar spine and right shoulder arthralgias, left lower leg swelling without

any evidence of edema, and right big toe neuralgias."  *Id*. at 419.

7

Progress notes from treating psychiatrist Dr. Siddiqi's office indicate that Plaintiff began treatment in May 2011.  Treatment records establish that Dr. Siddiqi evaluated Plaintiff in June 2011.  She diagnosed him with Post Traumatic Stress Disorder due to his gunshot wound, flashback, nightmares, paranoia, mood swings, defensiveness, and anger. *Id*. at 552.  His treatment included medication prescribed by Dr. Siddiqi and individual counseling with Margaret Baker, MSW.  It appears he attended counseling sessions about once a month.  *Id*. at 483-518.

On January 31, 2012, Dr. Siddiqi completed a form in which she indicated that Plaintiff was markedly limited in many areas of his mental-work abilities including, for example, the ability to remember locations and work-like procedures; to understand and remember detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to accept instructions and respond appropriately to criticism from supervisors; and to adapt to changes in the workplace.  *Id*. at 475.  She further opined that Plaintiff was moderately limited in his ability to make simple work-related decisions and to interact appropriately with the general public.  *Id*.  According to Dr. Siddiqi, Plaintiff was not significantly limited in his ability to understand and remember very short instructions; to carry out very short and simple instructions; to ask simple questions and request assistance; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to be aware of normal hazards and take appropriate precautions.  *Id*.  Dr. Siddiqi noted that

Plaintiff's diagnoses include post-traumatic stress disorder and bipolar disorder (No

Otherwise Specified).  Dr. Siddiqi reported, "[Plaintiff] has mood swings, flashbacks,

nightmares of past abuse & 'horrible things' he saw in prison; he also has fear and paranoia

which leads to him staying at home and isolating himself.  'I can't be around people." *Id*.

at 476.  Plaintiff's treatment included medications – namely Depakote ER, Elavil,

Trazadone, and Klonopin.  Dr. Siddiqi indicated, "[Plaintiff] has been clean of all drugs for

almost two years.  He is seen in individual therapy and psychiatric [follow up]." *Id*.  And,

Dr. Siddiqi opined that Plaintiff was "unemployable" and was likely to remain so for more

than a year.  *Id.* at 475.

On July 10, 2012, Dr. Siddiqi completed a mental impairment questionnaire.  *Id*. at

604-06.  She diagnosed Plaintiff with post traumatic stress disorder and anxiety, NOS.

Plaintiff's signs and symptoms included poor memory, sleep disturbance, mood

disturbances, emotional lability, delusions and hallucinations, psychomotor agitation or

retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness,

difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or

isolation, decreased energy, generalized persistent anxiety, plus hostility and anger.  *Id*.  Dr.

Siddiqi remarked that Plaintiff's flashbacks related to "past trauma [–] i.e. people stalked

and killed, blood gushing from throat."  *Id*. at 605.  She noted, "Flashbacks and

recollections of incidents in prison that he saw, people being killed and raped ... in prison.

Gets easily anxious and paranoid in groups [of] people." *Id*.  According to Dr. Siddiqi,

9

Plaintiff's "prognosis is guarded because of the mental illness past traumatic experiences and at present [he] cannot be productive at a job or tolerate being in a group setting." *Id*.

Dr. Siddiqi anticipated that Plaintiff's mental impairments or treatment would cause him to be absent from work more than 3 times a month, on average. *Id*. at 606. Dr. Siddiqi concluded that Plaintiff was markedly limited in his (1) restrictions of activities daily living; (2) difficulties in maintaining social functioning; and (3) "[d]eficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in a work setting or elsewhere)." *Id.* In response to whether Plaintiff would experience "[e]pisodes of deterioration or decompensation in work ..." as a result of his mental impairments, Dr. Siddiqi checked the line indicating Plaintiff had a "marked" limitation. *Id*.

## III. **"Disability" Defined and ALJ Flottman's Decision**

The Social Security Administration provides Supplemental Security Income to indigent individuals, subject to several eligibility requirements. Chief among these is the "disability" requirement. To receive Supplemental Security Income an applicant must be a "disabled individual." 42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who have a medically determinable physical or mental impairment that is severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A); *see Bowen*, 476 U.S.

at 469-70.

As noted previously, it fell to ALJ Flottman to evaluate the evidence connected to Plaintiff's application for Supplemental Security Income. She did so by considering each of the 5 sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 416.920(a)(4). She reached the following main conclusions:

Step 1: Plaintiff had not engaged in substantial gainful employment since his claimed disability onset date (October 6, 2009).

Step 2: Plaintiff has the severe impairments of residuals of status-post gunshot wound of the left lower extremity, right foot arthralgias, lumbar spine arthralgias, alcohol-induced mood disorder, alcohol dependence, cannabis dependence, post-traumatic stress disorder, and depression.

Step 3: Plaintiff does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Plaintiff's residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consisted of light work[2] with the following limitations: occasional stooping, kneeling, crouching, crawling, or climbing of ladders, ropes, or scaffolds; frequent climbing of ramps or stairs; no overhead reaching with the upper right extremity; no exposure to excessive vibration, moving machinery, or unprotected heights; simple, routine, and repetitive tasks that involve no reading or writing; low stress jobs (defined as no production rate or pace work); and only occasional contact with the public and coworkers.

Step 4: Plaintiff could not perform his past relevant work as a janitor.

Step 5: Plaintiff could perform a significant number of jobs that exist in the

---

[2] Under the regulations, "light work" requires the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. § 416.967(b).

national economy.

(Doc. #7, *PageID* #s 70-79).  In the end, the ALJ's finding at Step 5 led to her ultimate

conclusion that Plaintiff was not under a benefits-qualifying disability.

## IV.   <u>Judicial Review</u>

The Social Security Administration's denial of Plaintiff's applications for benefits –

here, embodied in ALJ Flottman's decision – is subject to judicial review along two lines:

whether the ALJ applied the correct legal standards and whether substantial evidence

supports the ALJ's findings.  *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir.

2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record

contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of

Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or

disagrees with the ALJ's factual findings or whether the administrative record contains

evidence contrary to those factual findings.  *Rogers v. Comm'r of Social Sec.*, 486

F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90

(6th Cir. 1999).  Instead, substantial evidence supports the ALJ's factual findings when "a

'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"

*Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th

Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less

12

than a preponderance...” *Rogers*, 486 F.3d at 241.

## V.    Discussion

Plaintiff's *pro se* Statement of Errors and Reply are lengthy and frequently quote passages from the ALJ's decision.  Plaintiff points out that although he has alleged pain in his back, leg, and shoulder, "his claim of depression was central to his application for disability benefits." (Doc. #10, *PageID* #652).  Construing Plaintiff's Statement of Errors in his favor, he challenges the ALJ's decision to credit the opinions of non-treating psychologists, Drs. Bonds, Goldsmith, and Tishler, rather than the opinions of his treating psychiatrist, Dr. Siddiqi.  Plaintiff also points out, in part, that (1) the Ohio Department of Job and Family Services determined he was eligible for Medicaid for the aged, blind or disabled; (2) the ALJ neglected to obtain records from his hospitalization on April 4, 2011 for psychiatric problems; and (3) he is unable to perform the jobs identified by the vocational expert because those jobs are not low-stress, and he cannot function properly around coworkers or supervisors.

The Commissioner contends that remand under sentence 6 of 42 U.S.C. §405(g) for consideration of medical records concerning Plaintiff's hospitalization on April 4, 2011 is not appropriate because the Appeals Council considered the evidence and because Plaintiff suffered no prejudice without the evidence before the ALJ.  The Commissioner maintains that the ALJ's finding that Plaintiff could perform a restricted range of light, unskilled work, encompassing a significant number of jobs, was based on her thorough review of the

evidence and substantial supporting evidence. The Commissioner further contends that the ALJ reasonably weighed the medical opinions and properly relied on the opinions of Dr. Bonds and Dr. Goldsmith concerning Plaintiff's mental-work limitations.

Social security regulations recognize several different types of medical sources: treating physicians and psychologists, nontreating/examining physicians and psychologists, and nontreating/record-reviewing physicians and psychologists. *See* 20 C.F.R. § 416.927(c), (e). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Social Security Ruling No. 96–6p, 1996 WL 374180, at *2 (July 2, 1996)). The strongest ties potentially arise between a treating-medical source and his or her patients. Given this, controlling weight must be placed on a treating-medical source's opinion when (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record." 20 C.F.R. §416.927(c)(2)); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014). If both conditions do not exist, the treating source's opinions are not controlling. The treating source's opinions, however, might still be due dispositive weight because the ALJ must continue to weigh the opinion under additional factors, "including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Gentry*, 741 F.3d at 723 (citation omitted). These factors

14

likewise apply to the ALJ's review of nontreating source's opinions.  20 C.F.R.

§416.927(e); *see* Soc. Sec. Rul. 96-6P, 1996 WL 374180 at *2

Plaintiff's arguments implicate the ALJ's findings at step 4 of her sequential

evaluation where she reviewed Plaintiff's medical records and evaluated the medical

source opinions.  When assessing Plaintiff's mental residual functional capacity, the ALJ

placed little weight on the opinions of Plaintiff's treating psychiatrist Dr. Siddiqi.  The ALJ

explained that her opinions were "unsupported by objective signs and findings in the

mental health treatment notes."  *Id*.  The ALJ continued,

> [T]he claimant has a significant history of substance abuse, but the
> recent treatment notes show no more than mild to moderate findings, which
> indicates improvement with abstinence, therapy, and medication.  The
> undersigned also gives little weight to Dr. Siddiqi's opinion that the claimant
> was "unemployable."  The determination of disability is a question reserved
> to the Commissioner, and there is no indication that Dr. Siddiqi is qualified
> to offer an opinion on claimant's employability.  The limitations in the
> residual functional capacity above adequately account for these mild to
> moderate findings document in Dr. Siddiqi's progress notes and elsewhere in
> the record.

*Id*. at 77-78.

The ALJ "essentially adopted the findings of the [Ohio Bureau of Disability

Determinations] consultative and reviewing psychologists...," Dr. Bonds, Dr. Goldsmith,

and Dr. Tishler   *Id*. at 77.  The ALJ "gives significant weight to their assessments, as they

are supported by objective signs and findings upon examination and in the preponderance

of the medical record, including those records submitted after their assessments."  *Id*.

The ALJ's evaluation of these medical sources opinions is problematic for several

reasons.  First, the ALJ's reliance on the lack of objective findings in support of Dr.

Siddiqi's opinions is misplaced.

> In general, mental disorders cannot be ascertained and verified as are
> most physical illnesses, for the mind cannot be probed by mechanical devices
> ... in order to obtain objective clinical manifestations of mental illness....
> [W]hen mental illness is the basis of a disability claim, clinical and
> laboratory data may consist of the diagnosis and observations of
> professionals trained in the field of psychopathology.  The report of a
> psychiatrist should not be rejected simply because of the relative imprecision
> of the psychiatric methodology or the absence of substantial documentation,
> unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817

F.2d 865, 873-74 (D.C. Cir. 1987)(other citation omitted).  Dr. Siddiqi's treatment notes

document observable signs that support her psychiatric opinions.  For example, January 17,

2012, Dr. Siddiqi reported that Plaintiff "continues to have moodswings, depressed often,

has flashbacks of past traumas and nightmares, but they are slightly less."  (Doc. #7,

*PageID* #529).  Later that month, Plaintiff "continues to have moodswings, dep[ression],

anx[iety], and mostly stays inside the house ...."  *Id*. at 534.  In April 2012, Plaintiff's mood

was depressed, his affect was constricted, and he demonstrated ideas of reference.  *Id*. at

545.  In December 2012, Plaintiff's depression continued with moodswings, and some

relief from flashbacks.  *Id*. at 529. These observation are consistent with and support Dr.

Siddiqi's opinion in late January 2012, that Plaintiff was markedly limited in many of his

mental work abilities.  *Id*. at 475-76.  Although the ALJ referred to "recent treatment notes

show[ing] no more than mild to moderate findings...," *id*. at 77, these findings appear in

boxes checkmarked by Dr. Siddiqi in the medical-electronic-record (MER) forms she completed. The forms do not contain any definition of these terms and do not purport to address Plaintiff's mental-work limitations. Additionally, the checkmarks appear in the MER's line for "Abnormal Findings," *see id*., thus making Dr. Siddiqi's checkmarked ratings relative to abnormal rather than normal findings. Without some definition of what mild, moderate, and severe means in connection with "Abnormal Findings," it stretches these checkmarks too far to conclude they do not support Dr. Siddiqi's opinions about Plaintiff's markedly limited mental-work (vocational) abilities, which Dr. Siddiqi provided at the same time. *See id*. at 534-35, 475-76.

The ALJ also placed little weight on Dr. Siddiqi's opinion that Plaintiff was "unemployable" because the "determination of disability is a question reserved for the Commissioner, and there is no indication that Dr. Siddiqi is qualified to offer an opinion on the claimant's employability." *Id*. at 78. It is correct to say that the regulations place the duty squarely on the ALJ to determine if an application for benefits is under a benefits qualifying "disability." 20 C.F.R. §416.927(d)(1). It is equally correct to say that a medical source's opinion that an applicant is under a "disability" or is "unemployable" does not require the ALJ to automatically agree and find the applicant eligible for benefits. *Id*. These correlative principles, however, play no role in an ALJ's evaluation of a medical source's, treating or otherwise, opinions. Instead, the principles and factors set forth in 20 C.F.R. §416.927(c) control the weighing of medical source opinions. The regulations,

17

moreover, promise social security applicants that the Commissioner will "consider opinions from medical sources on issues such as whether your impairment(s) meets or equals [the Listings] ..., your residual functional capacity, or the application of vocational factors ...," even though the Commissioner bears "the final responsibility for deciding these issues ...." 20 C.F.R. §416.927(d)(2). Consequently, to the extent the ALJ relied on the fact that Dr. Siddiqi offered her opinion about Plaintiff's employability, this was not a valid ground for discounting Dr. Siddiqi's opinions about Plaintiff's work limitations.

The ALJ's cursory review of Dr. Siddiqi's opinions also failed to provide reasons for rejecting or overlooking factors that supported placing greater weight on Dr. Siddiqi's opinions. This constitutes error. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *see Minor v. Comm'r of Soc. Sec.*, 513 Fed. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). The ALJ did not consider that Dr. Siddiqi had a more complete and longitudinal record to consider compared to the non-treating psychologists, Drs. Bonds, Goldsmith, and Tishler. This was especially significant because Drs. Bonds and Goldsmith provided their opinions in 2010, and Dr. Tishler provided his opinion in January 2011, before Dr. Siddiqi began treating Plaintiff and well before she provided her

opinions. *See* 20 C.F.R. §416.927(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we could give it if it were from a nontreating source."); *see also* §416.927(c)(3) ("We will evaluate the degree to which these [nontreating and nonexamining] opinions consider all of the pertinent evidence..., including opinions of your treating and other examining sources."). Dr. Siddiqi also provided specific information in support of her opinions about Plaintiff's marked limitations in his mental-work abilities. *See* Doc. #7, *PageID* #s 476, 695. It was incumbent upon the ALJ to consider and address this when discounting Dr. Siddiqi's opinions. *See* 20 C.F.R §416.927(c)(3) ("The better an explanation a source provides for an opinion the more weight we will give that opinion....").

The ALJ's decision to accept the mental-work limitations set by the non-treating psychologists likewise erred by referencing objective evidence that supposedly supported their opinions. Again, it is the observable psychological signs that appear in the record, not objective evidence, that is at issue when evaluating a medical source's opinions. *See Blankenship*, 874 F.2d at 1121. The ALJ, moreover, erred by crediting the moderate limitations set by Dr. Bonds even though his opinions were internally inconsistent on at least one point. Dr. Bonds opined that Plaintiff's "social functioning is severely impaired by his poor anger management and antisocial characteristics...." (Doc. #7, *PageID* #312). This conflicts with Dr. Bonds' opinion that Plaintiff's "ability to relate to peers,

19

supervisors, or the public is moderately impaired...."  *Id*.

Lastly, the ALJ's decision contains no indication that she considered in any way the disability decision by the Ohio Department of Medicaid's finding that Plaintiff is eligible for Medicaid.  *Id*. at 607.  Social Security regulations explain the non-binding nature of such decisions:  "We must make a disability ... determination based on social security law. Therefore, a determination made by another agency that you are disabled ... is not binding on us."  20 C.F.R. §416.904.  Yet, disability decisions by other agencies can be relevant to the Social Security Administration's disability determination in a particular case. Relevance "depends on the similarities between the rules and standards each agency applies to assess disability."  *LaRiccia v. Comm'r of Soc. Sec.*, 549 Fed. App'x 377, 387 (6th Cir. 2013) (citing Soc. Sec. Rul. 06-03, 2006 WL 2329939 at *6-*7 (Aug. 9, 2006)).  The Ohio Department of Medicaid administers Ohio's Medicaid programs.  Ohio resolves whether a person has a Medicaid-qualifying disability "as determined under Social Security Laws." http://medicaid.ohio.gov (search: "For Ohioans"; "Learn More About Who Is Eligible"). Because Ohio applies social security law to determine eligibility for Medicaid due to a disability, the Ohio agency's disability decision was directly relevant to Plaintiff's applications for benefits under Social Security programs.  As a result, the ALJ should have at least considered the Ohio agency's determination that Plaintiff was under a disability and eligible for Ohio Medicaid benefits.  *See* Soc. Sec. Rul. 06-03, 2006 WL 2329939 at *6-*7; *cf. Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 510 (6th Cir. 2013) ("We have held

that a disability rating from the Veterans Administration is entitled to consideration ....");
*McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (finding ALJ's failure to
mention VA's disability finding constituted error and noting, "[n]o circuit has held that an
ALJ is free to disregard an VA disability rating.").

    Accordingly, for the above reasons, the ALJ's decision must be reversed.[3]

## VI.    Remand For Benefits

    Remand is warranted when an ALJ's decision is unsupported by substantial evidence
or when the ALJ failed to follow the Administration's own regulations and that shortcoming
prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*,
478 F3d at 746.  This might arise, for example, when the ALJ failed to provide "good
reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47;
failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d
at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*,
741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence
for finding the plaintiff's credibility lacking, *Rogers,* 486 F.3d at 249.

    Under sentence 4 of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or
reverse the Commissioner's decision "with or without remanding the cause for rehearing."
*Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence 4
may result in the need for further proceedings or an immediate award of benefits.  *E.g.,*

---

[3] In light of the above discussion, and the resulting need to reverse the ALJ's decision, an in-depth analysis of Plaintiff's remaining challenges to the ALJ's decision is unwarranted.

*Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking."  *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A remand for an award of benefits is warranted in the present case because the evidence is overwhelming, or strong with contrary evidence lacking, that Plaintiff was under a benefits qualifying disability beginning on the date – January 31, 2012 – that Dr. Siddiqi first found him to be markedly limited in many of his mental-work abilities.  Such evidence is bolstered, moreover, by Dr. Siddiqi's opinion in July 2012 that she anticipated Plaintiff would be absent from work for 3 days per month.  This is significant because the vocational expert testified that no jobs would be available for such a person at any exertional level.  (Doc. #7, *PageID* #s 112-13).

Before January 31, 2012, the medical evidence was neither overwhelming nor strong while contrary evidence was lacking.  Instead, the ALJ's errors concerning the date before Dr. Siddiqi first provided her opinions, were harmless as to mental-work impairments.  This means that the ALJ's decision was supported by substantial evidence concerning Plaintiff's lack of a benefits-qualifying disability between the date, June 1, 2009, Plaintiff asserts he became disabled until January 31, 2012, the date of Dr. Siddiqi's disability opinion.  The record simply lacks meaningful probative evidence concerning any significant mental-work impairments Plaintiff may have had during this time.  Essentially, Plaintiff has not met his

burden of showing that he was under a disability between June 1, 2009 and January 31, 2012.  *See Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).  The additional evidence Plaintiff presented to the Appeals Council, most notably concerning his hospitalization admission in early April 2011, does not alter this conclusion.  Although his psychiatric symptoms were severe at the time of his admission, medical notes on the date of his discharge (3 days later) document that with treatment, his severe symptoms "improved quite rapidly and [he] was able to be discharged ...."  (Doc. #10, *PageID* #675).  Given this and the brief length of Plaintiff's hospitalization, this evidence was not likely to alter the ALJ's decision concerning Plaintiff's mental-work limitations before January 31, 2012.  As a result, such evidence was not material and does not warrant a sentence 6 remand for further consideration of whether Plaintiff was under a disability before January 31, 2012.[4]  *See Bass v. McMahon*, 499 F.3d 506, 512-14 (6th Cir. 2007).

In sum, an immediate award of benefits is warranted for the period beginning on January 31, 2012 and continuing thereafter.  This is so for the above reasons and since there is no further issue to resolve regarding this disability onset date and since there is no further

---

[4] "Sentence six of 42 U.S.C. § 405(g) allows a remand to develop additional evidence in the record, but only upon a showing that there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding."  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (citing 42 U.S.C. § 405(g)) (internal quotation marks omitted).  "A claimant seeking a sentence six remand bears the burden of showing these requirements met," *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 262 (6th Cir. 2015), which Plaintiff has not accomplished concerning his disability status before January 31, 2012.

reason to delay this award of benefits.

## IT IS THEREFORE RECOMMENDED THAT:

1.   The ALJ's non-disability decision be affirmed in part to the extent she concluded that Plaintiff was not under a disability from June 1, 2009 until January 30, 2012;

2.   The ALJ's non-disability decision be reversed in remaining part, and this matter be REMANDED to the Social Security Administration for payment of benefits consistent with the Social Security Act and with the disability onset date of January 31, 2012; and

3.   The case be terminated on the Court's docket.

December 9, 2015

s/Sharon L. Ovington
Sharon L. Ovington
Chief United States Magistrate Judge

24

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).

25